IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>              Intervenor<br>              Defendant,<br><br>vs.<br><br>FRANCIS MCLAIN, Individually, and as Co-Manager of TERA BANI RETREAT MINISTRIES; CAROLINE MCLAIN, Individually, and as Managing Director of TERA BANI RETREAT MINISTRIES; and ALAKHI JOY MCLAIN, SOHNJA MAY MCLAIN, AND DANE SEHAJ MCLAIN, as Beneficiaries of the E-3 RANCH TRUST,<br><br>              Defendants. | CV 16-36-BLG-SPW<br><br><br>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT |

## INTRODUCTION

This civil action was originally brought in 2014 by now-dismissed plaintiffs in Montana state court to resolve a probate dispute among members of the McLain family. Intervenor Defendant The United States of America removed the case to this Court in 2016 to foreclose on the property at issue in the probate dispute pursuant to certain federal tax liens.

The Court held a bench trial on November 14, 2022. Ryan Watson and Chelsea Bissell argued for the United States, and Alexander Roots argued for Defendants Francis ("Frank") McLain, *et al.* ("Defendants"). Following the trial, the parties filed proposed findings of fact and conclusions of law for the Court's consideration. (Doc. 328, 329).

Having heard the arguments and reviewed the evidence and proposed findings of fact and conclusions of law, the Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

**Background**

*E-3 Ranch*

1.  On June 21, 1996, Frank McLain and Brad Hall purchased the E-3 Ranch ("Ranch") in Park County, Montana. Frank received a 1/2 interest, and Hall received a 1/2 interest.

2.  At the time of this purchase, the Ranch was a 329-acre property.

3.  To purchase the Ranch, Frank and Hall co-signed on a $1 million loan from American Bank of Montana, secured by a mortgage on the Ranch.

4.  On June 18, 2003, 20 acres of the Ranch were quitclaimed to Hall as repayment for co-signing on the mortgage.

2

5.  On August 31, 2004, 34 acres of the Ranch were quitclaimed to Daryl Williams.  The Montana Sixth Judicial District Court in Park County quiet titled this parcel in Williams on October 2, 2018.

6.  As a result of these transfers, the Ranch is presently 275 acres.

*Creation of the E-3 Ranch Trust*

7.  On February 16, 1998, Frank created an irrevocable living trust, called the E-3 Ranch Trust ("Trust"), as an estate planning device.  Specifically, Frank wanted to protect the Ranch—which was valued at about $2 million—from federal estate taxes.  At the time, the federal estate tax exemption was $600,000.  By 2013, the estate tax exemption had risen to $5.25 million.

8.  Richard Humpal, who Frank met at a financial planning conference in the Paradise Valley, was the original trustee.  The beneficiaries were Frank's children—Alakhi J. McLain, Dane S. McLain, and Sohnja M. McLain—and his spiritual retreat, Tera Bani Retreat Ministries.  Each beneficiary received 25 units of beneficial interest in the Trust.

*Frank's Businesses*

9.  Frank has worked in nursing care and operated nursing staffing agencies for more than three decades.

10.  During most of the 1980s and 1990s, Frank operated Lifelines Cooperative Care, which became Lifelines Care, Inc. ("Lifelines") in 1988.

11.  Starting in the mid-1980s, Frank's parents—Bernard and Kathryn McLain—began loaning money to Lifelines.  Frank and Caroline McLain, Frank's wife, fell behind on payments for this loan.  On November 30, 1996, Frank and Caroline mortgaged the Ranch to Bernard and Kathryn to secure the loan.  Frank and Caroline also personally guaranteed the loan.

12.  In May 1990, an IRS agent began auditing Lifelines and found that Lifelines had impermissibly classified employees as independent contractors on tax forms.  In August 1998, Lifelines settled with the IRS for $500,000.

13.  Lifelines fell behind on payments to the IRS and was advised by an IRS agent to file for bankruptcy.  Lifelines filed for Chapter 11 bankruptcy in January 1999 and Chapter 7 bankruptcy in March 1999.

14.  The bankruptcy discharged Lifeline's debt from the IRS settlement and the loan from Bernard and Kathryn.  Bernard and Kathryn took a $150,000 bad debt deduction on their federal income taxes to account for the discharged debt.  However, because Frank and Caroline personally guaranteed the loan from Bernard and Kathryn, their liability was not discharged.

15.  Following Lifeline's bankruptcy and closure of Lifelines, Frank operated Kind Hearts, Kirpal Nurses, and All Heart Service.

16.  In January 2008, Frank was indicted for tax evasion for failing to pay employment taxes while operating Kirpal Nurses for tax years 2002, 2003,

4

and 2004. In April 2009, he was convicted and sentenced to prison. He was released from prison in November 2012.

**Conveyances of the Ranch**

17.  Lifelines' bankruptcy divested Frank and Caroline of their primary source of income, so they were unable to continue paying off Lifeline's loan to Bernard and Kathryn. Frank and Caroline quitclaimed Frank's 1/2 interest in the Ranch to Bernard and Kathryn on December 15, 1999, in exchange for $1, prohibiting foreclosure on the Ranch, and excusing Frank and Caroline from the payment schedule on the loan.

18.  Though the record does not contain the loan balance when Frank and Caroline transferred their interest in the Ranch to Bernard and Kathryn, the balance was $200,111.66 a year earlier at the end of December 1998.

19.  Other than Bernard and Kathryn, Frank's only other creditors when he transferred the Ranch to his parents were the banks holding the mortgages on the Ranch and a home he owned in Minneapolis, Minnesota, as well as debts on some credit cards.

20.  The record does not provide Frank's total assets at the time of the transfer. Since his business and primary source of income had gone bankrupt less than a year prior, his financial assets were presumably low. Frank also owned the home in Minneapolis and a property in La Plata County,

Colorado, though the record does not contain the value of either of these properties.

21. Between 1999 and 2002, Frank and Caroline continued to live fulltime on the Ranch after quitclaiming their interest to Bernard and Kathryn. Frank paid for the property taxes in 2000, property insurance, and tens of thousands of dollars in improvements.

22. Between 1999 and 2002, Defendants also paid Bernard $186,205 for the Ranch.

23. In February 2002, Kathryn died. Pursuant to Kathryn's will, which she amended in 2000, Bernard received her interest in the Ranch from her estate in July 2002.

24. Bernard also amended his will in 2000, directing his interest in the Ranch to be devised in the following manner: If Kathryn preceded him in death, 1/4 to be divided equally among his six children, Frank, Christeen A. McLain, Harley J. McLain, Faith McLain Kirchdofer, Mary McLain Bram, and John Bernard McLain; 1/4 to Alakhi; 1/4 to Dane; and 1/4 to Sohnja.

25. On July 22, 2002, Bernard transferred his interest in the Ranch to the Trust. By that time, Frank had repaid the loan from Bernard and Kathryn to Lifelines that Frank personally guaranteed, so Bernard's return of the Ranch

to the Trust was a standard return of the collateral that secured the Lifeline's loan.

26.   By returning the Ranch to the Trust, Bernard implicitly understood that the Ranch would now be subject to the terms of the Trust.

27.   On May 5, 2008, Hall quitclaimed his 1/2 interest in the Ranch to Frank and Caroline.   Each received a 1/4 interest.   The deed was recorded on April 23, 2010.

28.   Frank and Caroline were not immediately aware of this conveyance.   While in prison, Frank backdated a deed conveying his 1/4 interest to the Trust "as of the 5th day of May, 2008." Ex. 19.

29.   On February 27, 2013, the Trust conveyed its 3/4 interest in the Ranch to Caroline because the estate tax exemption was raised to $5.25 million. Frank and Caroline sought to refinance the loan on the Ranch, which Caroline was best suited to do because of her strong credit.   They were nevertheless unable to obtain refinancing.

**Occupation and Maintenance of the Ranch**

30.   Beginning as late as 1999, Frank and Caroline lived on the Ranch fulltime. Except for the time between September 2004 and May 2005, when Frank, Caroline, and their children lived at their house in Minneapolis, they both lived on the Ranch continuously until Frank's indictment in January 2008.

7

31. From the time Frank purchased the Ranch through 2008, Frank put 880 hours or more in labor toward the Ranch each year. Upon returning to the Ranch from prison in November 2012, Frank provided 100 hours of labor in 2012, and 1,000 hours in both 2013 and 2014.

32. For each year until 2010, Caroline dedicated 720 hours of labor to the Ranch. From 2010 to 2014, Caroline logged 400, 400, 600, 720, and 720 hours of labor.

33. Among the physical maintenance and improvements done by Frank and Caroline at the Ranch were extensive renovations of existing buildings, clearing meadows, fixing fences, constructing roads and bridges, and managing noxious weeds. From 1996 through 2014, the estimated cost of a partial list of improvements was nearly $300,000.

34. Frank paid the full mortgage on the Ranch until at least early 2008, possibly until April 2009, part of the mortgage from 2012 until 2018, and then the full mortgage again starting in 2018. When Frank could not pay the mortgage in full, Caroline fully or partially satisfied the mortgage.

35. Frank also paid the utilities from the time he purchased the Ranch until he went to prison. Though it is not clear when he resumed paying for utilities, he was paying for at least some of the utilities at the time of the trial in this case.

36. Frank paid most of the property taxes on the Ranch until 2006. Caroline paid the property taxes on the Ranch for the tax assessments due in 2006 through 2022, except for one payment made by her son, Dane, for the first half of 2012. Dane paid the taxes in exchange for Caroline working for his company, Soul Care, LLC.

37. Dane and his sister, Alakhi also worked on the Ranch as adults while Frank was imprisoned. Alakhi and Dane spent eight months laboring on the Ranch each in 2009 and 12 months each in 2010, 2011, and 2012.

38. Bernard began living on the Ranch with Frank and Caroline after being removed from a nursing home in June 2006. He lived there until his death on January 3, 2009.

39. Bernard did not pay any property taxes on, mortgage payments for, or other costs associated with the Ranch.

40. The Trust did not pay for any portion of the Ranch, its upkeep, or other expenses.

**Franks Criminal Conviction and Liabilities**

41. Frank was imprisoned for employment tax evasion in April 2009. Like the 1990s with Lifelines, Frank wrongfully classified employees as independent contractors. Pursuant to the judgment in the case, Frank owed $75,900 in restitution. A restitution lien was filed on the Ranch and Frank's

property in Minnesota on October 5, 2009. The lien was discharged on February 8, 2022.

42.   Frank also was convicted of damage to government property in the District of Montana in 2010. Pursuant to the judgment in the case, Frank owed $25,025 in restitution. A restitution lien was filed on the Ranch on January 25, 2010.

43.   On September 2, 2014, the IRS filed a civil Trust Fund Recovery Penalty assessment against Frank based on his criminal tax evasion conviction and unpaid employment taxes. The assessment balance was $469,156.24. Pursuant to the assessment, a federal tax lien was placed on the Ranch. The United States intervened in this litigation and removed it to federal court in order to foreclose on this lien.

**Procedural History**

44.   On September 19, 2013, formal probate of Bernard's estate commenced in the Montana Sixth Judicial District Court, Park County. On June 11, 2014, the state court stayed formal probate pending determination of the title to the Ranch.

45.   In August 14, 2014, Faith, Christeen, John, Mary, Harley's daughters Molly McLain and Mira McLain, and Harley's son Matthew ("Plaintiffs"), as beneficiaries for Bernard's estate, filed the complaint in this case against

Frank, Caroline, Alakhi, Dane, and Sohnja in the Montana Sixth Judicial District Court, Park County.  They sought a declaration that the Trust and its transfers are void, and so the Ranch is an asset of Bernard's estate.

46.    In April 2016, the United States intervened and removed the case to this Court to foreclose on its outstanding tax liens against Frank that were attached to the Ranch, among the other properties and property rights held by Frank.  The United States named Plaintiffs, Hall, and American Bank of Montana as counterdefendants because of the potential interest each held in the Ranch.

47.    On November 23, 2016, the Court dismissed Hall from the case after he verified that he had no interest in the Ranch.

48.    On May 8, 2018, the Court excused American Bank of Montana from participation in the case after it stipulated with the United States to the priority of the liens on the Ranch.

49.    On September 13, 2021, the Court granted a stipulated dismissal of all Plaintiffs' claims.  On September 22, 2021, the Court granted a stipulated dismissal of Plaintiffs.

50.    From 2016 until the trial, the parties also filed a variety of summary judgment motions.  In resolving those motions, the Court decided that the Trust was void, and any transfers of the Ranch made by the Trust were void.

51.   Defendants subsequently requested the Court reconsider its determination that the Trust and transfers were void, rather than voidable, because declaring it void would be inconsistent with the state court's validation of the Trust's transfer of 34 acres to Daryl Williams. The Court refused to entertain this argument, holding that the law of the case doctrine applied and Defendants had not proven that one of the exceptions to the doctrine applied.

52.   The Court also held on summary judgment that disputed material facts existed as to whether Caroline adversely possessed the Ranch, and whether the Trust could be revived through a variety of equitable remedies.

## CONCLUSIONS OF LAW

1.   This Court has subject matter jurisdiction because the United States brought its complaint pursuant to 28 U.S.C. § 2410, which allows the United States to be a party in any civil action in any U.S. district court where the United States is seeking to foreclose on a lien on the subject property. The Court has personal jurisdiction and venue is proper because the Ranch—the subject of the litigation—is located in Park County, Montana.

2.   At trial, the United States argued that Frank owns a 3/4 interest in the Ranch on which it can foreclose pursuant to its tax liens because (1) his conveyance of his 1/2 interest in the Ranch to his parents on December 15, 1999, was fraudulent, and (2) even if the conveyance was not fraudulent and Bernard's

estate owns the 1/2 interest in the Ranch, Bernard's estate holds title to the Ranch as Frank's nominee.

3.     Defendants disagree, arguing that the United States failed to produce sufficient evidence to prove either claim.  Additionally, Defendants contend that Caroline adversely possessed the 1/2 interest in the Ranch from Bernard's estate.  Further, Defendants request that the Court reform the invalidated Trust, or create a constructive trust, to effectuate the purposes of the Trust.  Finally, Defendants argue that the Court should validate the conveyances of the Ranch by the Trust to be consistent with the state court's quiet title of the 34 acres of the Ranch in Williams.

## Reformation of the Trust

4.     The terms of a trust may be reformed if clear and convincing evidence demonstrates the trust does not align with the settlor's intent due to a mistake of law or fact.  Mont. Code Ann. § 72-38-415.

5.     This Court already has determined that Bernard is the settlor with respect to his contribution of his 1/2 interest in the Ranch to the Trust.  (Doc. 221 at 12).

6.     Bernard's intent in transferring the Ranch to the Trust was to return the collateral that secured the loan from Bernard to Frank after Frank repaid the loan.

7.   Once the Ranch was returned to the Trust, it was subject to the purpose and terms of the Trust.

8.   Frank created the trust. His purpose in creating the Trust was to avoid estate taxes, since the estate tax exemption was $600,000.

9.   Because the estate tax exemption is now $5.25 million, and thus more than the value of the Ranch, the purpose of the Trust no longer exists and reformation is not appropriate.

10.  At this stage in the analysis, because reformation of the trust is not appropriate, Bernard's estate holds a 1/2 interest, Caroline holds a 1/4 interest, and Frank holds a 1/4 interest in the Ranch.

**Fraudulent Conveyance**

11.  A transfer of property made by a debtor is fraudulent as to a creditor, regardless of whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer either: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor, or (2) with constructive intent to hinder, delay, or defraud any creditor of the debtor. Mont. Code Ann. § 31-2-333(1)(a), (b).

*Actual Intent*

12.  In determining whether the debtor had actual intent to defraud the creditor, the Court can consider the following non-exhaustive factors:

14

(a)  the transfer was to an insider;

(b)  the debtor retained possession or control of the property transferred after the transfer;

(c)  whether the transfer was disclosed or concealed;

(d)  before the transfer was made, the debtor had been sued or threatened with suit;

(e)  the transfer was of substantially all the debtor's assets;

(f)  the debtor absconded;

(g)  the debtor removed or concealed assets;

(h)  the value of the consideration received by the debtor for the property was reasonably equivalent to the value of the asset transferred;

(i)  the debtor was insolvent or became insolvent shortly after the transfer was made;

(j)  the transfer occurred shortly before or shortly after a substantial debt was incurred; or

(k)  the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.*

13.   If the debtor is an individual, an insider includes a relative of the debtor.

Mont. Code Ann. § 31-2-328(7)(a)(i).

14.   These factors are known as "badges of fraud" that can "afford grounds of inference from which the court ... [is] authorized to conclude that a transaction surrounded by them is fraudulent." *Humbird v. Arnet*, 44 P.2d 756, 761 (Mont. 1935). However, the existence of such badges does not per se constitute fraud or provide conclusive proof. *Id.* Instead, their weight depends on their "intrinsic character and the special circumstances attending the case." *Id.*

15

15. The United States fails to prove actual intent. Though Frank transferred the property to an insider, retained possession and control of the property, and was insolvent before the transfer of the Ranch, he was neither sued nor threatened with suit *before* the transfer, and Bernard provided consideration for the property in the form of security for the loan. Given the focus of the statute is the invalidation of a conveyance made in order to avoid creditors, the Court gives great weight to these factors.

16. Further, it is not clear if the Ranch was substantially all of Frank's assets, because, though Frank had just declared bankruptcy for Lifelines—his main source of income—the record contains no evidence of the value of Frank's properties in Colorado and in Minnesota. Since, at the time of transfer, Frank owned both properties, their value is necessary for the Court to determine Frank's total assets and the percentage that the Ranch represents in his asset portfolio.

17. Finally, Frank did not conceal his other assets—namely his house in Minnesota—from creditors.

18. The factors rebutting actual intent have greater weight than those that support actual intent given the facts of this case, and thus the United States fails to prove actual intent.

*Constructive Intent*

16

19.     Constructive intent exists when the debtor, without receiving equivalent

value in exchange for the transfer of property, either (1) was engaged or was

about to engage in a business or transaction for which the debtor's remaining

assets were unreasonably small in relation to the business or transaction, or

(2) intended to incur, or reasonably should have believed that the debtor

would incur debts beyond the debtor's ability to pay as they became due. *Id.*

§ 31-2-333(1)(b)(i)-(ii).

20.     The United States has not met its burden of showing constructive intent.

First, the United States failed to rebut Defendant's evidence that Bernard

provided consideration for the transfer in the form of security for the loan.

21.     Second, Frank's responsibility for the mortgage on the Ranch is not a

relevant business or transaction in which Frank was engaged because Frank

intended the Ranch to serve as collateral for the loan from Bernard and

Kathryn.  As such, the transfer of the Ranch was a means of dealing with

another outstanding debt, not a discarding of assets in lieu of not paying the

mortgage.

22.     Third, the United States' argument that Frank must have reasonably believed

that he would have oncoming tax debts at the time of transfer fails because

Frank did not resume classifying employees as independent contractors until

2002—three years after the transfer of the Ranch.  Though the Court is not

17

convinced that Frank believed his conduct was legal, this temporal gap coupled with the consideration provided negates a finding of constructive intent.

23.   As such, the United States cannot prove constructive intent.

24.   Since the United States cannot prove actual or constructive intent, Frank's transfer of the Ranch to Bernard and Kathryn in December 1999 was not a fraudulent conveyance.

25.   At this stage in the analysis, since the conveyance of the Ranch from Frank to his parents was not fraudulent, Bernard's estate holds a 1/2 interest, Caroline holds a 1/4 interest, and Frank holds a 1/4 interest in the Ranch.

**Adverse Possession**

26.   "For a claim of adverse possession to succeed, the claimant must prove that the property was claimed under color of title or by actual, visible, exclusive, hostile and continuous possession for the full statutory period of five years." *Y A Bar Livestock Co. v. Harkness*, 887 P.2d 1211, 1213 (Mont. 1994).

27.   The claimant also must have paid the taxes on the property throughout the entire statutory period. *Smithers v. Hagerman*, 797 P.2d 177, 182 (Mont. 1990).

28. Each element of adverse possession must be proven by clear and convincing evidence. *Meadow Lake Estates Homeowners Ass'n v. Shoemaker*, 178 P.3d 81, 88 (Mont. 2008).

29. Claims of adverse possession against a family member carry a presumption of permission that must be rebutted with evidence of hostility. 4 Tiffany Real Prop. § 1889 (3d ed. 2022).

*Adverse Possession of Frank's 1/4 Interest*

30. Defendants fail to demonstrate that Caroline's possession of the Ranch was hostile or exclusive for the statutory period as to Frank. Even excluding the months Frank lived part-time on the Ranch and part-time in Minnesota after being indicted in January 2008, Caroline only lived on the Ranch without Frank from January 2008 to November 2012—four years and 10 months. This is less than the statutory period required for exclusivity.

31. Second, Defendants presented no evidence that Caroline's possession of the property was hostile to—or without the permission of—Frank. In fact, at trial, Defendants repeatedly characterized Caroline's and Frank's possessions as shared, since they are married, supporting the proposition that Caroline's presence on the Ranch was permissive.

32.   Accordingly, Defendants fail to demonstrate that Caroline's possession of
the Ranch was exclusive and hostile as to Frank. Thus, their adverse
possession claim with respect to Frank's 1/4 interest fails.

*Adverse Possession of Bernard/Bernard's Estate's 1/2 Interest*

33.   Defendants fail to demonstrate that Caroline's possession was hostile and
exclusive against Bernard and his estate for the statutory period.

34.   First, though Defendants aver that Caroline's adverse possession began on
May 5, 2008, Bernard was still alive and living on the Ranch at that point.
As such, Caroline's possession from May 5, 2008, until Bernard's death on
January 3, 2009, was not exclusive. Additionally, Defendants presented no
evidence that Caroline was living on the property without Bernard's
permission, so her possession from May 5, 2008, until Bernard's death on
January 3, 2009, was not hostile.

35.   When the owner of property dies, the claimant must adversely possess
against their devisees. *Commercial Bank & Trust Co. v. Jordan*, 278 P. 832,
835 (Mont. 1929).

36.   Defendants fail to show that Caroline adversely possessed against Bernard's
devisees, namely Frank, Alakhi, Dane, and Sohnja. As described, Caroline's
possession against Frank was neither exclusive for the statutory period nor
hostile. Further, Alakhi and Dane lived on the Ranch for eight months of

20

2009, and all of 2010-2012, thus interrupting any period of adverse possession beginning on May 5, 2008. Defendants also presented no evidence that Caroline possessed the property without the permission of Alakhi or Dane.

37.   Accordingly, Caroline did not adversely possess the Ranch against Bernard or his estate.

38.   At this stage of the analysis, since Defendants cannot prove adverse possession by Caroline against Bernard/his estate and Frank, Bernard's estate holds a 1/2 interest, Frank holds a 1/4 interest, and Caroline holds a 1/4 interest in the Ranch.

**Constructive Trust**

39.   "A constructive trust arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if the holder were permitted to retain it." Mont. Code Ann. § 72-38-123.

40.   A constructive trust claim should be limited to situations in which no other remedy exists. *Id.*

41.   For the Court to find a constructive trust exists, the party must "prove that the title holder would be unjustly enriched if they were permitted to retain title." *In re Marriage of Moss*, 977 P.2d 332, 337 (Mont. 1999).

42. To prove unjust enrichment in the context of a constructive trust, a party must show (1) a benefit conferred upon the title holder of the property; (2) an appreciation or knowledge of the benefit by the title holder of the property; and (3) the acceptance or retention of the benefit by the recipient under such circumstances that would make it inequitable for the recipient to retain the benefit without payment of its value. *N. Cheyenne Tribe v. Roman Catholic Church*, 296 P.3d 450, 457 (Mont. 2013) (internal citation omitted).

43. A claim for a constructive trust must be established by clear and convincing evidence. *Johnson v. Kenneth D. Collins Agency, Inc.*, 865 P.2d 312, 313 (Mont. 1993).

44. The Court already has found that Defendants have satisfied the first two elements of a constructive trust. (Doc. 221).

45. As to the third element, Bernard held title to the Ranch as collateral for the loan to Lifelines, so the evidence that the loan was paid off demonstrates that Bernard's estate has not contributed financially to the Ranch. Retaining a property for which they did not pay is inequitable, so a constructive trust is appropriate.

46. Critically, though, Defendants did not expressly state at trial or in its proposed findings of fact and conclusions of law *who* should hold the

22

constructive trust.  The United States also has not provided any clarity on this issue.  Since the Defendants generally assert that the Trust is the proper owner of the Ranch, the Court will assume Defendants intended to argue that the constructive trust should vest in the Trust.

47.   A constructive trust in the Trust is inappropriate because the Trust is not the victim of any unjust enrichment.  The Trust did not purchase or contribute funds to the property, nor participate in its maintenance and improvement.  It was merely a passive recipient and owner of the Ranch, prior to its invalidation by the Court.

48.   Accordingly, the Court declines to create a constructive trust for the Ranch in the Trust.  The policy behind equitable remedies for trusts—to effectuate the purposes of the trust unless illegal—is still satisfied since the non-entity beneficiaries of the Trust—Alakhi, Dane, and Sohnja—still receive interests in the Ranch pursuant to Bernard's will.

49.   At this stage of the analysis, since Defendants fail to assert in whom the constructive trust should vest, Bernard's estate holds a 1/2 interest, Frank holds a 1/4 interest, and Caroline holds a 1/4 interest in the Ranch.

**Validation of the Trust Conveyances**

50. Without an applicable exception, a court cannot revisit a prior ruling without abusing its discretion. *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).

51. The exceptions are: (1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result.

52. The Court already has applied the law of the case doctrine to Defendants' reoccurring argument that the trust conveyances—specifically the conveyance to Caroline in 2013—should be validated so as to be consistent with the state court's quiet title of the 34 acres transferred by the Trust to Williams.

53. Defendants again fail to demonstrate, let alone argue, that any of the exceptions to the law of the case doctrine apply here.

54. Accordingly, the Court refuses to validate the voided conveyances of the Ranch by the Trust.

55. Without validating the voided conveyances, and given the Court's findings on the previous issues, the Court holds that Bernard's estate has a 1/2 interest, Frank has a 1/4 interest, and Caroline has a 1/4 interest in the Ranch.

**Nominee**

56.   Federal tax liens attach to property held by a taxpayer in his own name and also to property held by the taxpayer's nominee. *Fourth Inv. LP v. United States*, 720 F.3d 1058, 1066-69 (9th Cir. 2013); *Towe Antique Ford Found. v. IRS*, 791 F. Supp. 1450, 1453 (D. Mont. 1992).

57.   "A nominee is one who holds bare legal title to property for the benefit of another." *Fourth Inv. LP*, 720 F.3d at 1067 (quoting *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001)).

58.   In determining whether a person is the nominee of another individual, the Court considers the following factors:

(a) No consideration or inadequate consideration paid by the nominee;
(b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;
(c) Close relationship between transferor and the nominee;
(d) Failure to record conveyance;
(e) Retention of possession by the transferor; and
(f) Continued enjoyment by the transferor of benefits of the transferred property.

*Towe Antique Ford Found.*, 791 F. Supp. at 1454.

59.   The United States has not met its burden of showing Bernard/Bernard's estate is Frank's nominee. Though the United States presented evidence that Bernard and Frank had a close relationship as father and son, and that Frank continued to possess and enjoy the benefits of the Ranch after the transfer,

Defendants demonstrated that Bernard paid consideration for the property by accepting the Ranch as security for the loan he issued to Frank, and that Frank was not anticipating any suits or new liabilities when he transferred the Ranch.

60. The bad debt deduction alone does not outweigh the evidence showing that since Frank paid Bernard and Kathryn back for the Lifelines loan—which he had personally guaranteed, as his parents' son—the same year that Bernard transferred the Ranch back to the Trust, Bernard provided consideration for the transfer of the Ranch.

61. Accordingly, Bernard/Bernard's estate is not Frank's nominee.

## Conclusion

62. The Trust and the conveyances from the Trust are void.

63. The Trust cannot be revived by any equitable remedies.

64. Frank's conveyance of the Ranch to Bernard and Caroline on December 15, 1999, is not fraudulent.

65. Caroline did not adversely possess the Ranch from Frank or Bernard/Bernard's estate.

66. Thus, Bernard's estate holds a 1/2 interest, Frank holds a 1/4 interest, and Caroline holds a 1/4 interest in the Ranch.

67.   No entity or individual serves as Frank's nominee.  Thus, the United States

can foreclose only on Frank's 1/4 interest in the Ranch pursuant to its tax

liens.

## ORDER

Accordingly, IT IS HEREBY ORDERED that the Clerk of Court shall enter

judgment in favor of Intervenor Defendant The United States of America on Count

III of the Intervenor Complaint (Doc. 20), and in favor of Defendants on Counts I

and II of the Intervenor Complaint (*Id.*).  The Clerk of Court shall close the case.

DATED this ___1st___ day of March, 2023.

SUSAN P. WATTERS
United States District Judge

27